**CHASE & RICE, INC.**

v.

**The UNITED STATES.**

**No. 532–58.**

United States Court of Claims.

Dec. 17, 1965.

W. Douglas, for defendant. James F. Merow, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge.

Plaintiff, a New Jersey corporation, alleged three counts in its petition pertaining to two different contracts. Subsequent to trial and the filing of the Report of the Commissioner, plaintiff elected to discontinue any further action with respect to the first two counts. We are therefore now concerned only with count three of the petition which relates to a contract awarded plaintiff for the supply of mountain sleeping bags to the Army.[1]

Plaintiff was awarded Contract No. DA 30–280–QM–23627 by the New York Quartermaster Procurement Agency, U. S. Army, on January 17, 1952. Under the terms of the contract, plaintiff was to furnish 58,000 sleeping bags to defendant. Shipment was to be made F.O. B. Bayonne, New Jersey, with tentative destinations of the bags to be Schenectady, New York and Auburn, Washington. Included in the contract was the usual disputes clause and a clause which provided for Government approval of all subcontracting. The latter clause read as follows:

25. NAMES AND LOCATION OF FACTORIES

The name and locations of the factories where manufacture of the items bid upon will be performed are set forth herein. The performing of any of the work contracted for in any place other than that named herein is prohibited, unless the same is specifically approved in advance by the Contracting Officer. If the Contracting Officer approves the use of any additional plant or factory by the Contractor in the performance of the work hereunder, extra costs to the Government (including extra costs in the transpor-

Herbert C. Klein, Passaic, N. J., for plaintiff. Philip S. Epstein, Passaic, N. J., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. John

---

1. The court has adopted the Trial Commissioner's findings as its findings. Included therein are the facts of plaintiff's discontinued counts.

tation of property furnished by the Government for fabrication hereunder, as a result thereof) will be charged to the Contractor. Full responsibility for the fulfillment of the contract will remain with the Contractor.

The only name and location of a factory set forth in the contract was that of plaintiff's plant in Bayonne, New Jersey.

On March 7, 1952, plaintiff wrote the New York Quartermaster Procurement Agency and requested that it be allowed to subcontract the sleeping bags to be shipped to Auburn, Washington (approximately 29,000 in number) to a California company. Plaintiff stated in the letter that " * * * it would reflect a considerable saving to the Government to have the F.O.B. point of the bags for Auburn, Washington, at Los Angeles."

Defendant replied through the Contracting Officer on May 26, 1952. The letter in part reads:

\* \* \* \* \* \*

Information currently available to this office indicates that deliveries to West Coast destinations are scheduled to commence July 1952. Shipping documents will be issued *to effect this change in f. o. b. point for deliveries scheduled to a West Coast consignee.* [Emphasis supplied.] \* \* \*

Modification 1 of the contract was then issued on June 20, 1952. It provided in part:

Contract is hereby amended to provide for

SUBCONTRACTING by—Reed Feather Co., 1917 Bay St., Los Angeles, Calif. who will perform the filling closing and shipping operations for 28,048 Bags, Sleeping, Mountain, scheduled for shipment to West Coast destinations, beginning July 1952 through December 1952. No additional cost to Government.

*Reason*: Request of contractor in order to facilitate delivery.

Thereafter, a dispute arose in October 1952 between plaintiff and its California subcontractor, the Reed Feather Company. As a result of the dispute the subcontract was cancelled.[2] By letter dated October 20, 1952 plaintiff advised the contracting officer that it had reached agreements with two Brooklyn, New York companies for the filling by each company of 14,024 sleeping bags. The contracting officer replied the next day, advising plaintiff that "in the event the proposed subcontractual arrangement [the Brooklyn subcontracts] is approved by this office any and all increased costs to the Government resulting therefrom shall be borne by you [plaintiff]." By letter of October 30, plaintiff wrote the contracting officer that "We wish to express our willingness to bear any extra costs that may be incurred by reason of the change of F.O.B. point." Plaintiff also stated that it believed there would be no extra costs since the original bid was evaluated on the basis of Bayonne, New Jersey as the shipping point. The subcontracts to the Brooklyn companies were approved on November 21, 1952, by letter of that date on the condition that plaintiff " * * * bear any and all increased costs including transportation costs by reason of the change in shipping points from F.O.B. Los Angeles, California to F.O.B. Brooklyn, New York." Modification 6 to the contract, issued on January 27, 1953, incorporated the change in subcontractors under the contract and provided:

\* \* \* \* \* \*

This subcontracting is permitted only on condition that any and all increased costs to the Government as a result of change in F.O.B. point from Los Angeles, California, to Brooklyn, New York, shall be borne by the prime contractor.

After deliveries on the sleeping bags from Brooklyn had begun, defendant sub-

2. The Findings of Fact do not reflect which of the two parties, Reed Feather or plaintiff, cancelled the subcontract. The point is, however, not relevant to the case at hand.

tracted from its remittances under the contract a sum equal to the difference in shipping costs from Brooklyn and from Los Angeles to Auburn, Washington. Plaintiff objected to this procedure, stating that defendant should not be allowed the advantageous Los Angeles rate. Plaintiff reasoned that since the Brooklyn rate was identical to the Bayonne rate (the rate at which the contract was originally awarded), the Government had not incurred any excess shipping costs. The contracting officer disagreed. He believed that under Modification 1 to the contract, the Government received a right to the lower freight costs from Los Angeles to destination. Therefore, when the F.O.B. point was changed to Brooklyn by Modification 6, the resulting freight rate from Brooklyn to Auburn, Washington, that defendant had to pay, rather than the lower rate from Los Angeles to Auburn, Washington, resulted in an excess cost to defendant which had to be borne by plaintiff under the terms of the contract.

The Armed Services Board of Contract Appeals affirmed the contracting officer's decision. The Board found that under Modification 1 the delivery point of the contract for the bags to be shipped to Washington was F.O.B. Los Angeles. Thereafter, the change of delivery point to F.O.B. Brooklyn resulted in an increased cost to defendant. Plaintiff was therefore held liable for the excess transportation costs.

At that juncture, plaintiff brought suit in this court for relief under the contract. Throughout this suit the parties have rigidly adhered to their original positions—plaintiff contending that there was no change in the F.O.B. point as a result of Modification 1, and defendant maintaining that it became entitled to the lower Los Angeles rate under Modification 1.

There is, however, an additional dispute that concerns the standard the court may use in reviewing the Board's decision. The parties are at variance in their delineations of questions of fact and law, as found by the Board. Plaintiff seems to feel that the whole dispute concerned an interpretation of contract terms, a question of law, and therefore under Beacon Construction Co. of Massachusetts v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963), not subject to the narrow standard of review imposed by the Wunderlich Act, 68 Stat. 81, 41 U.S.C. § 321 (1964 ed.). Defendant defends the finality and jurisdiction of the Review Board, maintaining the decision of the Review Board is purely a factual one and therefore final unless the decision is arbitrary, capricious, grossly erroneous, or not supported by substantial evidence, citing the Wunderlich Act, supra, and United States v. Carlo Bianchi & Co. Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

Another foray by this court into the furrowed field of fact-law distinction is not necessary in this case, however. Whether the Board's decision be one of fact, law, or mixed fact and law does not matter here. What does matter is that this court in applying the most liberal or most stringent standard of review is in agreement with the Board's decision. The Board found that under Modification 1 to the contract, the F.O.B. point was changed to Los Angeles, giving the Government the benefit of the lower freight charges. Plaintiff contests this point on the ground that there was no mention of an F.O.B. change in Modification 1. While it is true that the magic words "F.O.B. Los Angeles" were not included in the Modification, it must be remembered that "in the case of contracts the avowed purpose and primary function of the court is the ascertainment of the intention of the parties." Williston on Contracts, Third Edition, section 601. Union Pacific Railroad Co. v. United States, 10 Ct.Cl. 548 (1874), affirmed United States v. Union Pacific Railroad Co., 11 Ct.Cl. 1, 91 U.S. 72, 23 L.Ed. 224 (1875). Additionally, this court has held that the interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed to be of great, if not controlling weight.

Houston Ready-Cut House Company v. United States, 96 F.Supp. 629, 119 Ct. Cl. 120 (1951). In other words, the court may look at the contemporaneous construction given to the contract by the parties. The Board apparently applied the contemporaneous construction rule in finding that Modification 1 changed the F.O.B. point to Los Angeles. Both parties knew that under Section 25 of the contract, supra, any subcontracting was to be approved by the contracting officer. Plaintiff, therefore, by letter of March 7, 1952, requested the privilege of subcontracting. As an inducement to the Government to allow the subcontracting, it told the Government that there would be a considerable saving in shipping to the Government if the F.O.B. point was changed to Los Angeles. By letter of May 26, 1952 the Government agreed to plaintiff's proposal and specifically stated that shipping documents would be issued *to effect the change in F.O.B. point*. Surely, these facts show that the parties *intended* the F.O.B. point to be changed to Los Angeles. In light of these circumstances, the fact that the words "F.O.B. Los Angeles" did not appear in Modification 1 is not controlling. The parties intended the F.O.B. point to be changed, and this court, like the Board will not allow their *proven* intention to be thwarted by a technicality.

■ Plaintiff's main contention, lack of consideration for the condition attached to Modification 6, therefore fails.[3] Plaintiff's position is grounded on the premise that there was no change in F.O.B. point to Los Angeles by the issuance of Modification 1. We have shown this point to be in error. Since the pre-Modification 6 F.O.B. point was Los Angeles, definite consideration existed for the condition attached to Modification 6. Plaintiff received a definite benefit—the right to subcontract to the Brooklyn companies (there is evidence in plaintiff's exhibits that the Government was contemplating terminating the

contract for default at that time). In return, plaintiff agreed to pay the difference in shipping costs. Consideration, therefore, flowed both ways.

Plaintiff has raised an alternative argument for the court's consideration. Plaintiff argues that had it requested that it be allowed to perform the remainder of the contract in its plant in Bayonne rather than Brooklyn, it would have incurred no liability. Plaintiff reasons that the provisions of Paragraph 25 of the contract, supra, imposing extra costs, applies only when the contracting officer approves the use of any *additional plant*. Since Bayonne was already listed in the contract, it was not an *additional* plant, and therefore, even if the F.O.B. point had been changed to Los Angeles by Modification 1, a subsequent change back to Bayonne would not result in a price reduction. Since, as plaintiff continues, the shipping costs from Brooklyn are identical to the shipping costs from Bayonne, there should likewise be no price reduction as a result of the change to Brooklyn.

There are some loose ends which untie plaintiff's argument, however. First, plaintiff fails to realize that the right to lower shipping costs to defendant became vested at the time Modification 1 was approved. A change back to Brooklyn or Bayonne did not work to give defendant the cost reduction; Modification 1 had done that. Instead, the change constituted a cost *increase* for which plaintiff was liable. Second, once Modification 1 changed the place of manufacture for the West Coast destined sleeping bags to Los Angeles, Bayonne did in fact become an *additional* plant for that portion of the contract. Therefore a subsequent change back to Bayonne could be allowed only by approval of the contracting officer, and then presumably only on condition of liability for extra costs. Third, in any event, plaintiff has not shown it could have produced the prior subcontracted portion of the contract at Bay-

---

**3.** The condition referred to allowed the Brooklyn subcontracting only on the ground that plaintiff pay increase costs

which resulted from the change in F.O.B. point from Los Angeles to Brooklyn.

onne. It must be remembered that at the time the Brooklyn subcontracts were approved, plaintiff had not yet delivered any of the 28,048 sleeping bags to Auburn, Washington. Plaintiff was in serious danger of being defaulted, and presumably the reason *two* plants were chosen in Brooklyn was that the contract would be completed faster by using two facilities rather than one.

We therefore agree with the conclusion drawn by the Armed Services Board of Contract Appeals that plaintiff was obligated to pay the excess costs assessed. Plaintiff is not entitled to recover, and its petition is dismissed.