**Jack D. GAY, trustee for Shareholders of Northwest Uranium Mines, Inc., et al.**

**v.**

**The UNITED STATES.**

**No. 404–59.**

United States Court of Claims.

Feb. 18, 1966.

Richard D. Sanders, Pittsburgh, Cal., for plaintiffs; James E. Scott, Pittsburgh, Cal., attorney of record.

Edwin J. Reis, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

Plaintiffs ask for lost profits totaling $5,000,000 which is their alleged damage caused by the defendant's failure to enter into a contract to purchase their uranium

ore or concentrate.[1] They claim that the defendant's greatly publicized program to stimulate domestic uranium discovery and production constituted an offer which they accepted, or in the alternative, that they made an offer which the government accepted but refused to formalize. We hold that there was no contract, either unilateral or bilateral, and accordingly give judgment for the defendant.

The record in this case is voluminous. A thorough reading of the plaintiffs' exceptions and briefs alone is enough to exhaust the heartiest. Regrettably, the parties have not helped us by providing a summary of the facts and arguments. It is our particular good fortune to have an extremely thorough and ably presented "Findings of Fact" from our commissioner. We have made a number of minor changes in the findings to satisfy some of plaintiffs' exceptions. None of the changes has any effect on the outcome, however.

The history of Atomic Energy Commission (AEC) policy regarding uranium procurement is important to plaintiffs' legal theory. We note that one of the stated purposes of the Atomic Energy Act of 1946, 60 Stat. 755, as amended, 42 U.S.C. §§ 1801–1819 (1946 Ed.) was to assure the development of a domestic uranium industry which had been theretofore nonexistent. To this end, the AEC was granted very broad powers to purchase uranium source materials. 42 U.S.C. § 1805(b)(5) (1946 Ed.). One of these powers was to establish "guaranteed prices for all source materials *delivered to it* within a specified time." (Emphasis added.) In published regulations entitled "Domestic Uranium Program Circulars," the AEC established minimum prices for certain categories of uranium ores and concentrates. Thus, on August 11, 1948 in Circular No. 1, the AEC provided for a "ten year guaranteed minimum price" for high-grade uranium-bearing ores and mechanical concentrates *delivered to the Commission* in specified quantities. 10 C.F.R. § 60.1 (1949 Ed.). On the same day, the AEC announced in Circular No. 5 a guaranteed minimum price for "uranium-bearing carnotite-type or roscoelite-type ores [low-grade ores] of the Colorado Plateau area" *delivered* in certain quantities to the AEC depot at Monticello, Utah.[2] 10 C.F.R. §§

---

1. The style of this case is "Jack D. Gay, Trustee for Shareholders of Northwest Uranium Mines, Inc., a corporation in liquidation, Northwest Uranium Mines, Inc., a corporation in liquidation, Silver Buckle Mining Company, a corporation, [and] Idaho First National Bank Building, Wallace, Idaho, Plaintiffs." Northwest Uranium Mines, Inc. (Northwest) and Silver Buckle Mining Company (Silver Buckle) are Idaho corporations, each having its principal place of business in Wallace, Idaho. On May 10, 1958, the shareholders of Northwest voted to liquidate, and Jack D. Gay was appointed by the District Court of the State of Idaho to serve as trustee for the shareholders. Although the present claim is based on the activities of Northwest, Silver Buckle is an interested party because it acquired certain leases from Northwest and took over the operation of the ore body, promising to divide any profits in agreed proportions.

2. Circular No. 5, Revised, provides in pertinent part:

"§ 60.5 *Guaranteed minimum price for uranium-bearing carnotite-type or ros-*

*coelite-type ores of the Colorado Plateau area*—(a) *Guarantee.* To stimulate domestic production of uranium-bearing ores of the Colorado Plateau area, commonly known as carnotite-type or roscoelite-type ores, and in the interest of the common defense and security, the United States Atomic Energy Commission hereby establishes the guaranteed minimum prices specified in § 60.5a effective during the period, March 1, 1951, through March 31, 1962, for the delivery of such ores to the Commission at Monticello, Utah, in accordance with the terms of this section and § 60.5a.

\*     \*     \*     \*     \*

"(d) *Deliveries of not to exceed 1,000 tons per year.* To aid small producers, any one seller may deliver without a written contract but otherwise in accordance with this section up to, but not exceeding, 1,000 short tons (2,000 pounds per ton) of ores during any calendar year.

"(e) *Deliveries in excess of 1,000 tons per year.* Sellers desiring to deliver in excess of 1,000 short tons (2,000 pounds per ton) of ores during any calendar year will be required to enter into a con-

60.5, 60.5a (1958 Supp.). The substance of Circular No. 5 was repeated on May 24, 1956 when the AEC announced an extension of the procurement program.[3]

tract with the Commission providing for, among other things, a rate of delivery and the total quantity of ore to be delivered.

"(f) *Delivery.* Seller, at his own expense, shall deliver and unload all ores at the buyer's depot at Monticello, Utah. Deliveries shall be in lots of not less than 10 short tons (2,000 pounds per ton) unless special arrangements have been agreed upon by buyer, but such lots may be delivered in more than one load. Days and hours during which ore may be delivered will be posted at the depot.

\*    \*    \*    \*    \*

"(k) *Limitation of commitment.* Commitments by the Commission to accept delivery of ores are limited to the provisions of this section and § 60.5a as amended from time to time, or to written contracts between the Commission and sellers. Other commitments purporting to be made by the Commission's field personnel or other agents of the Commission will not bind the Commission unless they are in accord with the provisions of this section and § 60.5a or other official circulars.

"§ 60.5a. *Schedule I: minimum prices, specifications, and conditions.—* *(a) Prices.* Payment for delivery of the ores will be computed on the following basis:

"(1) *Uranium.* (i) Ores assaying less than 0.10 percent: no payment. Any such ores which are delivered to the purchase depot shall, unless otherwise specifically agreed to by buyer, become the property of the buyer as liquidated damages for buyer's expense of weighing, sampling, and assaying, and after sampling may be placed in process, commingled, or otherwise disposed of by buyer. If seller has any question as to the quality of his ore, it is suggested that before shipment and delivery to the purchase depot a representative sample be submitted to the buyer or to one of the umpires for assay at seller's expense. The buyer at its discretion may assay a limited number of samples without charge.

"(ii) Ores assaying 0.10 percent $U_3O_8$ and more, as follows:

| $U_3O_8$ assay: | Payment per pound $U_3O_8$ |
|---|---|
| 0.10 percent | $1.50 |
| 0.11 percent | 1.70 |
| 0.12 percent | 1.90 |
| 0.13 percent | 2.10 |
| 0.14 percent | 2.30 |
| 0.15 percent | 2.50 |
| 0.16 percent | 2.70 |
| 0.17 percent | 2.90 |
| 0.18 percent | 3.10 |
| 0.19 percent | 3.30 |
| 0.20 percent and more | 3.50 |

"(iii) Premiums on uranium: $0.75 per pound for each pound of $U_3O_8$ in excess of 4 pounds $U_3O_8$ per short ton (2,000 pounds per ton) of ore and an additional premium of $0.25 per pound for each pound in excess of ten pounds $U_3O_8$ per short ton. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent.

\*    \*    \*    \*    \*

"(3) *Allowances.* (i) A development allowance of $0.50 per pound $U_3O_8$ in ores assaying 0.10 percent $U_3O_8$ or more in recognition of expenditures incurred or likely to be incurred in the development or exploration necessary for maintaining and increasing developed reserves of uranium ores. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent.

"(ii) A haulage allowance of 6 cents per ton mile for transportation of ore paid for under § 60.5 and this section from the mine were produced to the purchase depot specified by the Commission, up to a maximum of 100 miles. The haulage distance from the mine to the purchase depot will be determine by the Commission and its decision will be final. Tonnages for purposes of this allowance shall be calculated on the basis of natural weights rather than dry weights.

\*    \*    \*    \*    \*

"(b) *Quality and size.* Ores will not be accepted by buyer under §§ 60.5 and 60.5a which, in buyer's judgment:

"(1) Contain less than 0.10 percent $U_3O_8$;

\*    \*    \*    \*    \*

"(3) Contain impurities deleterious to buyer's extraction process or for any other reason are not amenable to it;

\*    \*    \*    \*    \*

"NOTE: The Commission will be interested in discussing arrangements for delivery to it of types of uranium-bearing materials other than those for which guaranteed prices have been established, such as tailings, mill products, and ores of types not acceptable under §§ 60.5 and 60.5a."

3. The May 24, 1956 announcement provided as follows:

"The U.S. Atomic Energy Commission today announced establishment of a new domestic uranium procurement program for the period from April 1, 1962 through

In addition to encouraging discovery of uranium reserves by guaranteeing minimum prices, the AEC offered bonuses which operated primarily as an incentive for small producers. For example, Circular No. 2 provided for a $10,000 bonus to producers of ore or concentrates meeting certain conditions. 10 C.F.R. § 60.2 (1949 Ed.). Circular No. 6 provided for another bonus computed on a sliding scale to accord with the grade of ore. 10 C.F.R. § 60.6 (1958 Supp.). AEC officials made many statements of varying degrees of formality about the purposes of the domestic uranium program and its implementation. Industry officials, and even the general public to a lesser degree, were naturally very aware of the government's intention to encourage prospecting on a broad scale. The testimony and exhibits are replete with speeches, convention and congressional hearing transcripts, press releases and the like, showing that prior to 1957 the government was conducting a very aggressive uranium development program. It is no exaggeration to say that in this period of uranium "fever," when speculation in uranium shares was rampant and even children could purchase "junior" Geiger counters, it was widely assumed that the government stood ready to buy all the uranium anyone could find. It was in this atmosphere that the plaintiffs began their exploration activities in the summer of 1955.

For narrative purposes, we are primarily interested in the activities of Northwest Uranium Mines, Inc. (Northwest) which is represented here by its trustee in liquidation.[4] Northwest became an active corporation in May of 1955 when its shareholders contributed

December 31, 1966, and an extension of the initial production bonus for uranium ore from February 28, 1957, its present expiration date, through March 31, 1960.

"The new domestic procurement program provides a guaranteed market for all uranium concentrates produced by domestic mills from domestic ores, subject to a limitation, at the Commission's option, of 500 tons of $U_3O_8$ per year from any one mining property or mining operation and to compliance with Commission specifications. The price established is $8.00 per pound of $U_3O_8$ contained in normal mill concentrates or precipitates.

"This action was taken in recognition of the need for a continuing Government market in order to maintain a high rate of exploration and development. Although domestic uranium production has shown a remarkable expansion, known ore reserves will be greatly depleted by 1962 unless extended by aggressive development and exploration. A high rate of discovery is essential if substantial production is to be maintained after that date. The new domestic uranium procurement program provides assurance of a government market for an additional period of almost five years beyond March 31, 1962. This assurance will assist uranium mining and milling firms in planning future operations.

"The present uranium ore procurement program will remain in effect until March 31, 1962. The new program establishes a base price for domestic uranium concentrates, rather than ores, for the period from April 1, 1962, through December 31, 1966. The base price will be $8.00 per pound of $U_3O_8$ contained in concentrates meeting specifications. This price will be applicable to the type of concentrate, i.e., high grade chemical precipitates, which is being purchased presently under negotiated unit price contracts with milling companies.

"The $8.00 price was determined on the basis of a study of existing contracts, known sources of supply and estimated costs of production.

\* \* \* \* \*

"Uranium concentrate producers desiring to sell to the Commission will be required to enter into contracts specifying the period of delivery, the quantity to be delivered, the rate of delivery, the place of delivery, the type of packaging and other standard provisions of commercial-type contracts. The contracts may cover the period April 1, 1962, through December 31, 1966, or a shorter period. The Commission, at its option, may limit the purchase of concentrates derived from any one mining property or mining operation to 500 tons of $U_3O_8$ per year. Depending upon requirements additional quantities may be purchased. Such purchases of additional quantities may be at prices lower than $8.00.

\* \* \* \* \*

"Pertinent details of the new program will be published at a later date."

4. See n. 1, supra.

about $100,000 operating capital. This really understates the capitalization because the principal shareholders were other mining companies and individuals engaged in the mining business who stood ready to contribute more capital and free services, the latter being particularly important to a prospecting venture. With its capital, Northwest purchased a small airplane and retained a pilot to conduct an airborne reconnaissance program in an area near Spokane, Washington. With a scintillometer, Northwest personnel detected a number of radiation "anomalies" indicating the existence of uranium-bearing ores. Follow-up ground examination proved that only one of the anomalies had potential for development. This was located on the Spokane Indian Reservation near the Midnight Mine, owned by the Dawn Mining Company.

In October 1955, Northwest procured prospecting permits by assignment from two Spokane Indians, and immediately used a bulldozer to strip overburden to expose the uranium-bearing rock formations for examination. In addition, Northwest was able to drill for samples before the December snows. About this time, Northwest's vice president and general manager visited the Defense Minerals Exploration Administration (DMEA) office at Spokane to discuss the possibility of an exploration loan. Here begins the story of Northwest's dealings with defendant.

During late 1955, it was Northwest's intention to develop its property and sell the ore in such a way that it could preserve its depletion allowance for Federal income tax purposes. To this end, it sent a letter on December 10, 1955 to the manager of the AEC's office at Grand Junction, Colorado. This was the office charged with administering AEC uranium procurement. The substance of this letter was that Northwest was interested in a contract providing that the AEC purchase concentrate from Northwest ore treated by a milling company on a toll basis. The letter posed the following question:

*Can we enter into negotiations* with the Atomic Energy Commission to sell to you a concentrate from our ore that is treated by some other mill on a toll basis. Another phase of this question might be, *can we enter into a contract* whereby we have our ore treated on a toll basis then sell the concentrate to the milling firm. [Emphasis added.]

The AEC replied on December 14 that depletion was an Internal Revenue matter, outside AEC jurisdiction. Regarding a contract to purchase uranium concentrate, the letter responded to Northwest's inquiries as follows:

If you are interested in the possibility of constructing a mill to process ores produced in the Spokane area, the procedure followed by the Commission is to consider detailed proposals submitted by private companies for the construction and operation of a plant and the sale to the Commission of uranium concentrates produced. Concentrates meeting required specifications are purchased by the Commission at unit prices under the terms of negotiated contracts.

The letter emphasized that particular attention should be focused on developing an adequate ore supply to assure economic operation of the mill throughout its useful life. Northwest did not reply to this letter, nor did it engage in any substantial negotiations with the AEC until July 1957. During this hiatus, Northwest was engaged in a drilling and assaying program to establish its ore reserves.

Financing for exploratory operations was arranged with the DMEA on June 15, 1956 in an exploration contract providing for a $29,160 loan. By November 1956, the drilling program was substantially completed, and in January 1957, the AEC Spokane office engineer estimated Northwest's uranium ore deposits on a .06 percent "cutoff" (ores below cutoff cannot be economically processed) at 616,009.75 tons of ore averaging .116 percent $U_3O_8$ (uranium oxide). This was somewhat lower than Northwest's esti-

mates, allegedly based on more drillings and showing 683,660.48 tons of ore containing 1,578,244.33 pounds of $U_3O_8$.

With reserves satisfactorily established by late 1956, Northwest again began to consider the most desirable way to sell its ore. Its first thought was to investigate the possibility of constructing facilities to chemically upgrade the ore to a concentrate which could be processed in an existing mill for ultimate sale to the AEC. Northwest was encouraged to pursue this route because in August 1956 the AEC and Dawn Mining contracted for the construction and operation by Dawn of a new processing mill. This contract contained the usual provision that Dawn must make available 25 percent of the mill's total capacity (400 tons of uranium-bearing ore per day) to "custom" ores of independent producers. The Northwest ores, if upgraded, would qualify. Thus, in August or September of 1956, Northwest consulted the designer of the Dawn mill to determine the feasibility of an upgrading scheme. He determined that the ore could be mixed with chemicals to produce a wet solution which, after a drying process, would yield a slurry containing 8 percent $U_3O_8$. This slurry could be put through the circuits of a custom mill to produce a concentrate containing 70 percent $U_3O_8$. Armed with this information, Northwest arranged a conference on January 3, 1957 with the AEC Grand Junction manager. Northwest knew the AEC was not interested in buying the slurry. The purpose of the conference was to explore the possibility of selling the slurry to existing mills holding concentrate contracts with the AEC. The Grand Junction manager reiterated AEC policy, and counseled Northwest to negotiate the matter with the mills.

Northwest thereafter contacted the Vitro Uranium Company, a custom producer in Salt Lake City, Utah, in addition to Dawn. After extensive research on mill facilities and transportation difficulties, both Dawn and Vitro informed Northwest that they could not pay prices acceptable to Northwest for ore or slurry. Vitro said it might be interested if the

AEC would amend the provisions of an existing concentrate contract; Dawn indicated that it would have to alter its facilities, which would likewise necessitate amending an existing AEC contract. In a letter on July 13, 1957, Northwest explained these difficulties to the AEC Grand Junction manager. It proposed a contract for the installation of a uranium concentrator plant to produce the 8 percent slurry which would be processed further. Because Dawn and Vitro could not process the slurry on an economic basis, Northwest suggested that any contract provide, in addition, for Northwest's installation of a continuous ion exchange unit (which could produce a 70 percent $U_3O_8$ product acceptable for AEC use without further processing) or an ammonia precipitating process (which would produce a 15 percent $U_3O_8$ product acceptable for AEC use if blended with other concentrates). Northwest readily acknowledged that its proposal was unusual:

The contemplated concentrator does not follow the usual uranium plant design in that we will produce a low grade concentrate assaying approximately 8% $U_3O_8$ from ore assaying 0.124% $U_3O_8$, and it is anticipated that the product will be processed further in an existing mill.

It also made it clear that it contemplated a relatively short use period for the concentrator plant:

This one reserve [about 600,000 tons] allows for at least a four year operation at this daily tonnage rate [400 tons].

And it specified as an additional provision that it intended to process *only* captive ore: "the flow sheet as developed will not accomodate custom ore."

Between July 13 and October 9, 1957, Northwest's vice president and general manager doggedly pursued AEC procurement officials. In a series of phone calls and visits, the AEC officials put Northwest off with statements to the effect that they had not been able to review the July 13 proposal. They told Northwest

that the reason for their hesitancy was that they were reviewing the AEC's procurement policy in the light of the increased supply of proven uranium ore reserves. By late 1956, total uranium reserves had risen to more than 60,000,000 tons primarily due to the discovery of about 30,000,000 tons in the Ambrosia Lake area near Grants, New Mexico. The AEC Grand Junction manager did say, however, that the proposed price for the Northwest ore was one of the most reasonable he had seen, and he suggested that he would review a detailed proposal for a uranium concentrator and mill that included a cost analysis. This Northwest submitted on October 9, 1957.

Although the detailed proposal was quite comprehensive, the AEC could not have "formalized" it into a contract without extensive investigation by its experts and negotiations between Northwest and AEC officials. The proposal never received this kind of consideration, however, because the Commission was then reviewing its requirements for future purchases of uranium concentrates. Northwest was informed to this effect on October 22, 1957. Less than a week later, on October 28, 1957, the AEC Director of Raw Materials announced in a speech that the Commission would thereafter follow a new procurement policy. Relevant to Northwest's ambitions was the following language:

* * * we have arrived at the point where it no longer is in the interest of the Government to expand production of uranium concentrate. It has been apparent for some time that this point was being approached.

* * * Since the beginning of this year, the possibilities of additional major increases in domestic uranium production have become apparent.

* * * * * *

Under these circumstances the Commission, at this time, is faced with limiting commitments for additional domestic uranium production. Proposals for domestic contracts which already have been submitted and are under review still will be considered in the light of the discussions which have taken place. In some instances these discussions were initiated a year or more ago.

It is reasonable to assume that it was because of this announced policy change that no further consideration was given to Northwest's proposal nor was Northwest invited to negotiate. It is also reasonable to assume that the AEC felt that the previous discussions with Northwest were too tentative to warrant further consideration "in the light of the discussions which have taken place." After October 28, the Commission in fact rescinded the authority of its procurement officials to negotiate any new contracts which had not been approved in substance before the announced policy change.

Plaintiffs urge that these facts make out a good cause of action for the recovery of the profits they would have made had the defendant purchased their uranium product. Their first argument is that an "implied in fact" contract came into being by their acceptance of the AEC's continuing offer to purchase "all economically and metallurgically amenable uranium ores irrespective of the type of ore involved or its geographical location." They find an offer in the whole AEC procurement program. More particularly, plaintiffs look at Circular No. 5 and the May 24, 1956 announcement, and add to them administrative practice, public addresses, press releases, and customs. The total of all these ingredients constitutes the extremely broad "continuing offer." This, they assert they accepted by means of specific contract proposals first on July 13, 1957, and again on October 9, 1957, upon their "tender" of the Northwest ore body to the Commission. Their theory, of course, dates acceptance before AEC revocation, which they contend took place on October 28, 1957; alternatively, they say that the offer was never revoked as to them because the October 28 announcement provided that "proposals for domestic contracts which have already been submitted and are under review still will be con-

sidered in the light of discussions which have taken place."

▮ Addressing ourselves to the problem of "offer," we are not persuaded that all of the ingredients plaintiffs add together to make up a "continuing offer" can constitute an offer. It seems to us that plaintiffs are attempting to make the whole equal to a good measure more than the sum of its parts. Although we fully recognize that prior to October 28, 1957 the AEC appeared to be eager to stimulate uranium discovery and production, and published guaranteed minimum prices to that end, we do not think that there was any offer to purchase *all economically and metallurgically amenable uranium ores irrespective of the type of ore involved or its geographical location.*

In Radium Mines, Inc. v. United States, 153 F.Supp. 403, 139 Ct.Cl. 144 (1957), we considered the applicability of Circular No. 1 to a more limited claim. There, we said that Radium Mines, Inc. had no contract with the government because the AEC reasonably determined that the uranium was not recoverable, as was its right under the express terms of Circular No. 1. We answered the government's argument that Circular No. 1 was not an offer by saying:

> It could surely not be urged that one who had complied in every respect, with the terms of the Circular could have been told by the Government that it would pay only half the "Guaranteed Minimum Price," nor could he be told that the Government would not purchase his uranium at all. [153 F.Supp. 403, 406, 139 Ct.Cl. 144, 148.]

The position of the plaintiffs here is "shakier" than Radium Mines, Inc. They concede, of course, that "technically" the Circular No. 5 "offer" could not comprehend their ores as it expressly applies only to "carnotite-type or roscoelite-type ores of the Colorado Plateau area" delivered to the AEC buying depot at Monticello, Utah. Nor could Circular No. 1 comprehend their concentrate, as it applies only to high grade ores and concentrates. So they are forced to broaden

any "offer" that might be contained in the circulars, and they do this by directing us to the policy statements, notably the May 24, 1956 announcement, and the alleged procurement practices of the Commission. We do not need to state precisely what the AEC's offer might have been. It is enough to say that it was not sufficiently broad to have ripened into the contract plaintiffs assert here.

▮ Even if we were to accept plaintiffs' theory of continuing offer, we do not think plaintiffs have shown that they either did accept or could have accepted it simply by submitting proposals. For the bilateral, "implied in fact" contract plaintiffs seek to establish, we look for facts which permit us to infer a "return promise * * * [from] a document, an act, or a course of conduct." The Padbloc Co., Inc. v. United States, 161 Ct. Cl. 369, 377-378 (1963). The decision in *Radium Mines* (although focusing on unilateral contract theory) can be read as saying that such a contract comes into being when the producer accepts the government's offer by "putting itself in a position to supply the ore described in the circular." Himfar v. United States, Ct. Cl. No. 328-60, 355 F.2d 606, 609, decided January 21, 1966. In our recent per curiam decision in *Himfar*, we chose this approach, and held that a regulation relating to the purchase of manganese ore at guaranteed minimum prices induced such "significant action" by the plaintiff to find and mine ore that the government was obligated to receive and pay for ore meeting the requirements of the regulation. We said that "[t]he consideration for this obligation was the plaintiff's finding of manganese and his efforts to produce it." Ct.Cl. No. 328-60, 355 F.2d p. 610.

▮ Although this theory might at first appear to give plaintiffs heart, we feel that they fail both the tests of "significant action" and "meeting the requirements of the regulation." In *Himfar*, the plaintiff had received the required certificate of authorization and had made substantial deliveries of ore. It was the government's refusal to accept

and unload a delivery, as well as its refusal to accept future shipments, that precipitated the lawsuit. By contrast, plaintiffs here have made no deliveries. In fact, at the time Northwest submitted the specific proposals it had never mined ore. There were, of course, good reasons for Northwest to hold back on further development until a contract could be finalized. We appreciate that the AEC was the sole market for uranium and that no reasonable businessman would proceed beyond the development stage until he could be sure he could sell the product to the AEC on a profitable basis. It would simply have been impossible for Northwest to have done much more than it did; but what it did was not enough, and we say this with full knowledge that Northwest no doubt reasonably relied on the AEC's general policy of buying almost all available uranium products.

In holding that plaintiffs have not accepted the offer they assert here, we look to the problem of price, the low grade of the ore and the complexity of the proposal for upgrading it in the concentrator plant, the short life period of the stated reserves when compared with the usual amortization period for uranium processing mills, and the fact that Northwest proposed to process only *its* ores contrary to general AEC policy which was to make some plant capacity available to custom producers. Surely many of these problems could have been ironed out in negotiations between plaintiffs and the AEC, and a contract could have been "formalized." This is not the kind of contract a court should feel constrained to write, however. This is precisely the kind of contract that the AEC intended to leave to negotiation, and Circulars No. 1 and No. 5, as well as the announcement of May 24, 1956 and the statements by AEC officials to Northwest, gave ample notice of this intention.

■ Probably the plaintiffs' best argument is that the government is estopped to deny the existence of a contract because of plaintiffs' reliance. This is really the promissory estoppel theory we alluded to in *Radium Mines*. Much of what we have said above answers this argument, but in the interest of clarity, we dispose of this contention separately. The Restatement of Contracts binds the promisor "if injustice can be avoided only by enforcement of the promise" when the promisor makes a promise which he "should reasonably expect to induce action * * * on the part of the promisee * * * and which does induce such action." Restatement, Contracts § 90, Tent. Draft No. 2 (April 30, 1965). We do not resort to section 90 lightly; it is not an automatic rule. "Injustice" is the ultimate test, and this leaves us great flexibility. In determining whether this test is met, we shall be guided by the following factors:

> Satisfaction of the latter requirement [enforcement must be necessary to avoid injustice] may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant. [Restatement, Contracts § 90, Comment b, Tent. Draft No. 2, p. 166 (April 30, 1965).]

When we apply these criteria to Northwest's activities and dealings with the AEC, we find that plaintiffs fall far short of the mark.

Looking first at the "promise," which is the alleged "continuing offer" discussed earlier, we are not persuaded that the AEC should have expected that it would be bound to a contract by action like that performed by Northwest. We think that the AEC could have reasonably anticipated that it would be bound only by more substantial performance in accordance with the precise terms of its circulars, or, of course, by a negotiated

contract. We do not feel that justice requires us to charge the defendant with plaintiffs' hoped for profits where the reliance consisted of exploration and the preparation of an integrated plan for the mining and processing of ore. Regarding the "formality with which the promise is made," we note that plaintiffs had ample notice that negotiated contracts were the rule for situations deviating from relatively limited provisions of the circulars. There was no formal promise to buy *all* uranium regardless of mining and processing difficulties, and any informal promise was not sufficiently broad to comprehend plaintiffs' reliance. Finally, as a matter of policy, we do not think this is the proper case for us to "avoid injustice" by enforcement of a "promise." As we mentioned earlier in discussing plaintiffs' acceptance argument, the contract plaintiffs assert involves exceedingly complex, technical issues that could be resolved only by extensive study and negotiations. The interests of "the commercial setting" would not be well-served by our finding that a contract existed here.

Similarly, the plaintiffs do not have a claim for partial enforcement.[5] They have not established that they did anything more than many other parties who unsuccessfully "bid" for a contract with the government. For partial enforcement by promissory estoppel, we would look for something more. Like the first year law student confronted with the problem of determining at what point there is an enforceable contract where someone promises $5 to any person who crosses the Brooklyn Bridge,[6] we would at least require the promisee to get to the bridge. In the present action, plaintiffs did not reach that point.

In summary, we hold that defendant neither made the offer plaintiffs allege nor did plaintiffs accept any offer, and plaintiffs did not make an offer which the defendant accepted. Plaintiffs understandably hoped that a contract would be consummated, but the defendant's change in procurement policy was reasonable and within the business risk which plaintiffs assumed as uranium speculators. Granting that the change in policy on October 28, 1957 was to be prospective only and all prior proposals were to be viewed "in the light of the discussions which have taken place," we feel that the parties were at no time close to a contract and that the AEC was accordingly reasonable in discontinuing negotiations after the policy change.

The petition is dismissed.

---

5. Plaintiffs ask for no remedy other than lost profits. Section 90 of the No. 2 Tentative Draft of the Restatement of Contracts (April 30, 1965) has added the following sentence: "The remedy granted for breach may be limited as justice requires." The Reporter comments: "The principal change from the original Restatement is the recognition of the possibility of partial enforcement." Tent.

Draft No. 2, p. 173. Since plaintiffs have a more appealing claim for damages covering provable reliance, we have reviewed the facts in the light of the trend shown in the Restatement.

6. Wormser, The True Conception of Unilateral Contracts, 26 Yale L.J. 136–139 (1916).