PACIFIC FAR EAST LINE, INC.

v.

The UNITED STATES.

No. 119–63.

United States Court of Claims.

May 10, 1968.

Mark P. Schlefer, Washington, D. C., attorney of record, for plaintiff, T. S. L. Perlman, Washington, D. C., of counsel.

Allan J. Weiss, Admiralty & Shipping Section, Dept. of Justice, San Francisco, Cal., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Paul H. McMurray, with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on June 5, 1967. Exceptions to the commissioner's opinion, findings and recommendation were filed by the parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, the court concludes that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

McMURRAY, Commissioner:

Pacific Far East Line, Inc., (PFEL) sues for damages under the Tucker Act, 28 U.S.C. § 1491 (1964), alleging that defendant breached its operating-differential subsidy (ODS) agreement with plaintiff by improperly withholding portions of subsidy funds due and payable to PFEL.

In my opinion plaintiff is entitled to recover.

In order to alleviate or diminish the complexities of this case, the parties requested and were permitted to present oral argument before the commissioner after they had filed their briefs under Rule 57. No transcript reflecting the oral argument was filed with the clerk of the court, but the transcript of testimony taken at the trial is very extensive. Complexities are involved in this case primarily because the events giving rise to the claim occurred over a 10-year period and involved voyages of many vessels which (voyages and vessels) are subject to a variety of classifications having many legal aspects.

PFEL, a Delaware corporation with its primary place of business in California, had engaged in the transoceanic foreign commerce of the United States since 1946. Anticipating keen competition from foreign shipping operators, PFEL sought an ODS to help replace its vessels with more efficient ships as a means of maintaining its favorable competitive position. Proceedings on the application were held pursuant to Title VI of the Merchant Marine Act of 1936 (hereinafter Act), 49 Stat. 2001, as amended, 46 U.S.C. §§ 1171–1183a (1964). Pacific Far East Line, Inc., 4 F.M.B. 7 (No. S–19, 1952). The defendant through the Federal Maritime Board,[1] subsequently entered into a subsidy contract (FMB–22) on December 31, 1952. FMB–22 covered the period from January 1, 1953 through 1962, which is the

---

\* The dissenting opinion of NICHOLS, *Judge*, follows the opinion of the Trial Commissioner which has been adopted by the court.

1. The 1936 Act was first administered by the former United States Maritime Commission. By Reorganization Plan No. 21 of 1950, effective May 24, 1950 (64 Stat. 1274, 15 Fed.Reg. 3178 (1950)), the Federal Maritime Board and the Maritime Administration succeeded to the Commission's powers and duties. By Reorganization Plan No. 7 of 1961, effective August 12, 1961 (75 Stat. 840, 26 Fed. Reg. 7315 (1961)), the Secretary of Commerce succeeded to the Board's powers and duties under the Merchant Marine Act of 1936. Some of these powers and duties have been delegated to the Maritime Administrator by Department of Commerce Departmental Order No. 117. See 27 Fed.Reg. 3637 (1962) and references therein.

period of time (sometimes referred to as the recapture period) in which the activities giving rise to this case occurred. Later the parties substituted another contract (FMB–81) for FMB–22, effective January 1, 1959, but FMB–81 provided that the first recapture period should remain January 1, 1953 through 1962. The substitution does not change the issues in this case because the controversial contract provisions and the recapture period remain substantially the same. In this opinion both contracts may be referred to as one or as the agreement.

PFEL agreed to operate certain vessels on the service described by the contract (sometimes called the subsidized service) in accordance with the terms and conditions of the contract. In return, defendant promised to pay a subsidy toward various costs as determined by the contract. FMB–22 described the subsidized service as a berth service of a restricted number of outward sailings on essential Trade Route 29—Service 2 as follows:

Between the California ports of Los Angeles and San Francisco and Yokohama, Kobe, Osaka, other Japanese ports (as traffic offers). Shanghai, other North China ports and ports in Manchuria and Korea (as traffic offers), Hong Kong, Manila, Philippine Islands outports, French Indo-China and Siam (as traffic offers); with privilege of calls at ports of U.S.S.R. in Asia.

FMB–81 described the service as between "ports in California" and, basically, the same Far Eastern ports. The agreement imposed upon PFEL an obligation to replace its old subsidized ships with new vessels and the new vessels became "subsidized vessels," i. e., the voyages of these vessels on the subsidized service were entitled to subsidy, as they were acquired.

2. All articles preceded by Roman numeral II are standard provisions in ODS contracts.

3. Defendant's entrance into the agreement was expressly based upon a determination

Article II–16[2] of FMB–81 provided in part:

(a) Without the express approval of the United States, * * * [PFEL] shall [not] operate or cause or permit to be operated any unsubsidized vessel, * * * in competition with any subsidized service of the Operator [PFEL] or in the foreign commerce of the United States in competition with any other essential United States flag service, route, or line, as defined in applicable rules and regulations of the United States.

Article II–16 was included because defendant felt that it had a statutory duty to prevent the continuity of the service and the quality of operations from being adversely affected[3] and because it had a contingent financial interest in the profits from subsidized operations by virtue of Article II–28.

Section 606(5) of the Act, 49 Stat. 2004, as amended, 46 U.S.C. § 1176(5) (1964), requires the inclusion in every ODS contract of language which constitutes the substance of Article II–28 of the agreement. Thus, the contract provided the following recapture formula:

(a) At the expiration of each 10-year recapture period during which, without interval, an immediately preceding subsidy agreement, this agreement, or a consecutive agreement shall have been in effect * * *, and upon the final termination of subsidized operations, the United States shall determine the amount of the net profits of the Operator on its subsidized vessel(s) and services incident thereto (without regard to capital gains and capital losses) during each 10-year recapture period, or the period to the final termination of subsidized operations, after deduction of depreciation charges based upon a life expectancy

that the subsidized service would be essential for the promotion, development, expansion and maintenance of foreign commerce of the United States. Section 601(a) of the Act, 49 Stat. 2001, as amended, 46 U.S.C. § 1171(a) (1964).

of the subsidized vessel(s) determined as provided in Section 607(b) of the Act. Forthwith upon such determination, if such net profit for any such period has averaged more than 10 per centum per annum upon the Operator's capital investment necessarily employed in the operation of the subsidized vessel(s), service(s), route(s), and line(s) the Operator shall pay to the United States an amount equal to one-half of such profits in excess of 10 per centum per annum, less amounts already retained, as partial or complete reimbursement for operating-differential subsidy payments received by the Operator for such recapture period, but the amount of excess profits so recaptured shall not in any case exceed the amount of * * * subsidy payments theretofore made * * * under this agreement or consecutive agreement(s) and the payment of such reimbursement * * * shall be subject to * * Section 607 of the Act and Articles II–26 and II–29 hereof.

* * * * * *

In effect, plaintiff's claim is for subsidy moneys withheld by defendant because the periodic payments of subsidy by defendant to PFEL were reduced by defendant's corresponding estimates of its recapture interest. Plaintiff, therefore, hopes to bring about a recalculation of defendant's recapture interest. Plaintiff cites the Article II–28 phrase "and services incident thereto," and contends that defendant's improper failure to include the financial results of certain nonsubsidized voyages, and inclusion of the financial results of other nonsubsidized voyages, as "services incident thereto" constitutes a breach of the contract resulting in the calculation of greater excess profits (i. e., profits subject to recapture by the United States) than would have been determined had the voyages been otherwise treated for recapture purposes. Defendant's basic defense is

that Article II–16, relating to competing nonsubsidized operations, gave it the discretion to determine which of the nonsubsidized voyages should be included in the recapture formula and that defendant properly exercised its discretion. Resolution of this dispute requires understanding of the nature of the nonsubsidized voyages and analysis of the accounting involved.

In December 1952, before the ODS agreement was finally executed, PFEL informed the Maritime Administration (MARAD) by letter that it desired to operate certain nonsubsidized services. The letter stated that PFEL did not believe these services required the approval of MARAD under Article II–16 and that these services would not compete or conflict with the subsidized service, but it requested that MARAD treat the letter as an application for express approval if such approval was deemed necessary. The Maritime Administrator, treating the letter as an Article II–16 request, acted on it on November 17, 1953, and his letter of November 25, 1953, informing PFEL of his action largely sets the stage for this case.

The Administrator approved the following nonsubsidized services subject to stated conditions: (1) transpacific reefer service (i. e., transportation of food products under refrigeration) between United States West Coast ports, Alaskan ports and certain Far Eastern ports, many of which were also on the subsidized service; (2) Pacific-Guam and transpacific bulk cargo[4] services consisting of "usually two sailings monthly in the service 'California ports direct to Guam with general cargo, then to Japan with bulk cargo as well as one or two sailings monthly direct to Japan and Korea with bulk cargo * * *. Vessels are to return to California ports in ballast.' * * *" The term "in ballast" means "empty" or without cargo.

---

4. Bulk cargoes are fungible commodities such as ore loaded directly into the ship rather than loaded in containers or packages. Bulk cargo rests against the skin of the vessel. It may be carried in full shiploads or in parcel lots (less than full cargo capacity of the vessel).

The letter constituted prior approval for the reefer voyages; but it required PFEL to submit sailing schedules, and to acquire MARAD's prior approval of those schedules, for voyages in the Pacific-Guam and bulk services. The letter also stipulated that the approval granted therein was subject to conditions pertaining to the financial treatment of these voyages. Thus, all nonsubsidized voyages made exclusively outside the subsidized service (off-route) were to be excluded) from the recapture formula while all such voyages conducted entirely within that service (on-route) were to be included. Further

(e) In the event any of the voyages made by these vessels are partially within and partially without the subsidized service (characterized as "split voyages"), the financial results of such voyages shall be accounted for on the basis of each such voyage as determined by the Administration with respect to each six-month period of terminated voyages.

This case is concerned primarily with split voyages although there is controversy regarding certain on-route voyages which must also be determined.

### Interpretation of "Services Incident Thereto"

We shall use plaintiff's nonsubsidized reefer service as the vehicle by which we construe the phrase "services incident thereto." Plaintiff's nonsubsidized reefer service from 1953 through 1958 included over 200 on-route and split voyages. The acquisition of Mariner vessels and their introduction into the subsidized service pursuant to the contract caused this nonsubsidized service to be phased out. Apparently there were 21 nonsubsidized split reefer voyages which MARAD refused to include in the recapture accounting formula for the years 1955 through 1958.[5] Plaintiff contends that one such voyage conducted in 1956 earned 50 percent or more of its revenue from cargo carried between ports on Trade Route 29. The remainder appears to have earned less than 50 percent of its revenue from such carriage. There is evidence suggesting that the nonsubsidized reefer service met inadequacies in the subsidized service. In view of these facts plaintiff asks this court to hold that MARAD should have included all of these split reefer voyages in recapture accounting on the theory they augmented or complemented the subsidized service and, consequently, were incident thereto.

■■■ Plaintiff may not obtain relief on this theory. Placing its reliance on the word "incident" in Article II–28, PFEL suggests that its meaning is "naturally * * * appertaining, esp. as a subordinate or subsidiary feature." The adjective "incident"[6] is not a precise term, and it admits of other shades of meaning also. For example, it may mean "occurring or likely to occur esp. as a minor consequence or accompaniment" or also "dependent on or relating to another thing." Webster's Seventh New Collegiate Dictionary (1963). To seize on one shade over another as a means of expressing the particular relationship between the incident services and the subsidized

---

5. Since defendant will have a chance to present evidence relating to damages, these and other similar figures are not binding on the parties and the court in relation to the issue of damages.

6. The word "incident" describes the "services * * * thereto." Clearly, plaintiff thinks likewise because it goes to great lengths to demonstrate that "services" is a comprehensive term denoting "the entire scope of an operation." Pacific Transport Lines, Inc.—Subsidy, Route 29, 4 F.M.B. 7, 11 (Docket No. S–18, 1952). The phrase would have no meaning if both "services" and "incident" were merely descriptive terms. That "incident" describes the relationship between "subsidized vessel(s) and services incident thereto" is also clear from the context. A contrary reading not only violates ordinary usage but also ignores settled rules of interpretation requiring unstrained and reasonable construction. Southern Constr. Co. v. United States, 364 F.2d 439, 453, 176 Ct.Cl. 1339, 1362 (1966); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 976, 979. 169 Ct.Cl. 384, 390, 395 (1965).

vessels might be proper if the ambiguous phrase had been reasonably construed by plaintiff.[7] Kraus v. United States, 366 F.2d 975, 979–980, 177 Ct.Cl. 108, 116, (1966), and cases therein cited. This contract, however, must be interpreted as a whole, or, in other words, the intention of the parties must be gathered from the whole instrument. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 169 Ct.Cl. 384 (1965). The interpretation should give a reasonable meaning to all provisions without construing any as being in conflict with another "unless no other reasonable interpretation is possible." Ibid. This is particularly true where the provision sought to be affected is a standard mandatory clause of broad application. See Thompson Ramo Wooldridge, Inc. v. United States, 361 F.2d 222, 228, 175 Ct.Cl. 527, 536 (1966). Clearly we may not close our eyes to the fact that Federal law (49 Stat. 2004 (1936), as amended, 46 U.S.C. § 606(5) (1964)) requires the inclusion of the disputed language. A. H. Bull S. S. Co. v. United States, 108 F.Supp. 95, 99, 123 Ct.Cl. 520, 528 (1952); G. L. Christian & Associates v. United States, 312 F.2d 418, 424, 160 Ct.Cl. 1, 12 (1963), cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314. A necessary corollary is that, if we go beyond the contract to ascertain its meaning, we should look to the history of the legislation to determine the meaning of the language which must be included in the instrument. Cf. Russell Motor Car Co. v. United States, 261 U.S. 514, 43 S. Ct. 428, 67 L.Ed. 778 (1923).

Article II–28 is deficient in that it does not expressly state the nature of the relationship between the subsidized vessels and the incident services. Although nonsubsidized voyages are not mentioned, both parties argue that some should be included in the formula. Moreover, both parties sought to include certain nonsubsidized voyages in the formula during the operation of the agreement.[8] Further, these services are in addition to the subsidized vessels; and the Maritime Administrator has defined "service" in Maritime Administration, U. S. Department of Commerce, Essential United States Foreign Trade Routes 76 (July 1960), as follows:

> The means of providing transportation over a trade route, including the itinerary, sailing frequency, number and type of vessels to be employed. A service may be contained entirely within the limits of a designated trade route, * * * [or] a service may extend into other trade routes * * *.

The administrative cases hold that "service" contemplates "the entire scope of an operation." Pacific Transport Lines, Inc.—Subsidy, Route 29, supra. See American Export Lines, Inc., 1 M.S.B. 236, 249 (Docket No. S–135, 1963); Lykes Bros. S. S. Co., 4 F.M.B. 153, 158 (Docket No. S–23, 1953); Grace Line, Inc., 6 F.M.B. 82, 86 (Docket No. S–113, 1960). In *Grace Line* the Board said that "the words 'service, route, or line' should receive the same construction in section 606(4) as they receive in sections 601(a) and 603(a), and for the same reason." Ibid. The same must be true for section 606(5). Thus, it is clear that at least some split and on-route nonsubsidized voyages are contemplated by Article II–28.

7. That an ODS contract must be construed in the same manner as any commercial contract is the valid assumption underlying this statement and the interpretation of this agreement. Capital Necessarily Employed—General Order 71, 4 F.M.B.–M.A. 646, 654–55 (Docket No. S–66, 1952), and citations therein; cf. S. Rept.No. 1618, 75 Cong., 3d Sess. 3 (1938).

8. This point is particularly persuasive because the contemporaneous construction of the disputed language before it becomes the subject of judicial controversy is entitled to great weight when this court must interpret the language. Chase & Rice, Inc. v. United States, 354 F.2d 318, 321–322, 173 Ct.Cl. 740, 746 (1965); Microcord Corp. v. United States, 361 F. 2d 1000, 1004, 176 Ct.Cl. 46, 53 (1966); Blanchard v. United States, 347 F.2d 268, 273, 171 Ct.Cl. 559, 566 (1965).

■ A hint concerning which voyages are to be included appears in Article II–28 insofar as it speaks of "the *operation of the* subsidized vessel(s), *service*(s), route(s), and line(s)." [Emphasis supplied.] The obvious purpose of this article is to permit the defendant to share in the "excess" profits generated by subsidized operations to the extent that subsidy is paid. This was apparently all that Congress intended when it enacted and amended section 606(5) (49 Stat. 2004 (1936), as amended, 46 U.S.C. § 1176(5) (1964)). S.Rept. No. 1618, 75th Cong., 3d Sess. 14–15 (1938); 79th Cong.Rec. 9901 (1936) (remarks by Senator Guffey); S.Rept. No. 898, 74th Cong., 1st Sess. 38–47 (1935); S.Rept. No. 1859, 84th Cong., 2d Sess. 1 (1956), U. S. Code Cong. & Admin.News 1956, p. 2513. None of those sources, nor any historical data related to the section, which we have found, speak in terms of nonsubsidized voyages or operations, but they focus entirely on subsidized operations wherever the recapture concept is discussed. It would be contrary to the obvious purpose of Article II–28 to include in its scope the financial results of voyages which do not reflect subsidized operations.

■ Voyages which compete with the subsidized vessels reflect potential subsidized operations. Such voyages may draw cargo from the subsidized vessels. Where one party controls both the subsidized and nonsubsidized voyages, it may determine which ones will perform the best in terms of cargo carried. The defendant may have anticipated a diversion of the subsidy to nonsubsidized vessels by way of allocation, or manipulation, of cargoes;[9] obviously Article II–16 was written into the contract to guard against that possibility. That provision expressly gives the defendant the right to approve or disapprove prospective requests to conduct voyages competitive with the subsidized service. By this logic the

defendant, acting pursuant to Article II–16, lacked contractual authority to approve or disapprove noncompetitive, unsubsidized reefer voyages. The conditional approval of November 25, 1953, was made pursuant to Article II–16, and therefore, necessarily contemplated competitive reefer voyages. Since MARAD had the contractual right either to approve or to disapprove competitive voyages, it would be improper to hold that a qualified or conditional approval lacked a valid contractual basis. Cf. Jack Stone Co. v. United States, 344 F.2d 370, 374, 170 Ct.Cl. 281, 287–288 (1965). To the extent that Article II–16 was a basis for approvals, it must be read in conjunction with Article II–28. The November 25, 1953 approval granted by MARAD was conditional in that it, *inter alia,* expressly reserved for the defendant the right to determine in the future the accounting basis for the financial results of split voyages. Behind this reservation was MARAD's theory that the impact of nonsubsidized split voyages on revenue of subsidized voyages could not be determined until after the completion of the split voyage. MARAD, therefore, sought to effectuate the purpose of the contract. It cannot be held to have breached the contract by reasonably exercising its discretion. See Fox Valley Eng'r, Inc. v. United States, 151 Ct.Cl. 228, 236–237 (1960); Jack Stone Co. v. United States, supra, 344 F.2d at 373, 170 Ct.Cl. at 286.

■ The above comments regarding the nonsubsidized reefer voyages apply to the transpacific bulk and the Pacific-Guam services insofar as plaintiff contends they were complementary. The fact that they may have complemented, as plaintiff defines that word, the subsidized service has no bearing on whether MARAD could impose reasonable conditions pursuant to Article II–16. To the extent that the voyages were competitive with the subsidized service, MARAD had the right under Article II–16 to deter-

9. The facts do not suggest that PFEL intended or engaged in such manipulation, and it should not be inferred that PFEL sought to avoid its contractual obligation by such means.

mine a reasonable basis on which split voyages in these nonsubsidized services would be included in recapture accounting. Since plaintiff also contends that the methods used to select nonsubsidized voyages for accounting purposes and the bases on which periodic accounting treatment rests were arbitrary and capricious, we turn our attention to specific voyages and periods of time during which the various accounting treatments were used.

*Recapture Accounting for Split Voyages*

 Contracts for cooperation-differential subsidies are to be treated like any other commercial contract between the United States and a private party. Capital Necessarily Employed—General Order 71, 4 F.M.B. 646, 654 (Docket No. S–66, 1952); cf. S.Rept. No. 1618, 75th Cong., 3d Sess. 3 (1938). The defendant's rights and responsibilities under this contract are similar to those of a private individual who is a party to a contract (G. L. Christian & Associates v. United States, supra, 312 F.2d at 423, 160 Ct.Cl. at 11, and cases cited therein), and defendant normally is subject to "the same rules of law that govern private individuals." Hughes Transp., Inc. v. United States, 121 F.Supp. 212, 228, 128 Ct.Cl. 221, 245 (1954). A party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously. Jack Stone Co. v. United States, supra, 344 F.2d at 373, 170 Ct.Cl. at 286; Fox Valley Eng'r, Inc. v. United States, supra; Ferguson & Edmondson Co. v. United States, 89 F.Supp. 135, 138, 116 Ct.Cl. 246, 268 (1950); Wm. Eisenberg & Sons to Use of Aetna Cas. & Sur. Co. v. United States, 75 F.Supp. 1006, 1008–1009, 110 Ct.Cl. 388, 422–424(1948); cf. First-Citizens Bank & Trust Co. v. United States, 76 F. Supp. 250, 110 Ct.Cl. 280 (1948). This court will grant relief where contractually exercised discretion is abused. Fox Valley Eng'r, Inc. v. United States, supra, Jack Stone Co. v. United States, supra. But there can be no relief from an erroneous judgment exercised in good faith pursuant to valid discretionary power.

Cf. Ferguson & Edmondson Co. v. United States, supra. As decided herein, Article II–16 gave MARAD the discretion of determining whether a nonsubsidized voyage was competing with the subsidized service and, when read with Article II–28, to take steps to assure that recapture reflected the financial results of the competing nonsubsidized service. We shall now decide whether MARAD's actual treatment of nonsubsidized split voyages was a proper exercise of its discretion within the legal guidelines previously discussed.

The 10-year recapture period may be viewed in four aspects or parts, each representing a period of time for which a different method was used to determine which voyages should be included in recapture accounting. Therein lies the basis for plaintiff's contention that MARAD acted inconsistently and, therefore, arbitrarily in exercising its discretion to determine which voyages fit the recapture formula. The first part of the recapture period includes the years 1953 and 1954. Except for three 1954 voyages discussed in a later part of this opinion, plaintiff agrees with the results obtained by MARAD's treatment for 1953 and 1954. For the sake of continuity we shall discuss the means used to reach those results. MARAD had reserved the right to determine the accounting basis for split voyages in the letter of November 25, 1953. MARAD intended to make this determination based on a standard or guideline which it termed a test of the "competitive impact/substantial involvement" of nonsubsidized voyages with the subsidized service. This test constituted MARAD's interpretation of the phrase "services incident thereto" in Article II–28. Mr. Callahan, an experienced MARAD examiner, analyzed each nonsubsidized voyage for 1953 and 1954 in 1954 and 1955, respectively, to determine which voyages were substantially involved with or had a competitive impact upon the subsidized service. He based his analysis upon the various factors: (1) his personal knowledge of PFEL's operations and of traffic movements on

the trade route; (2) ports served by each voyage; (3) cargoes carried; and (4) a comparison with subsidized voyages. Financial results of unsubsidized voyages were not in Callahan's analyses. Acting on Callahan's recommendations, MARAD included all split voyages (except the three to be discussed later) in the recapture formula for 1953 and 1954. [Ibid.]

The treatment afforded split voyages occurring between January 1, 1955 and March 7, 1957, involves a major portion of plaintiff's claim. In 1958 and 1959 PFEL included all split voyages in its preliminary accountings for 1955 and 1956, respectively, because it was determined, with apparent justification, that such a basis was consistent with the 1953 and 1954 method. On April 25, 1957, MARAD adopted General Order No. 80. 46 C.F.R. §§ 281.11–281.17 (1966). That regulation provides that the financial results of nonsubsidized voyages by subsidized operators.

> shall be included in the subsidized operations for recapture and reserve fund purposes if * * * 50 percent or more of the total gross voyage revenue is derived from carrying cargo between ports within the subsidized service, and

that voyages deriving less than 50 percent of such revenue from such carriage shall be excluded. 46 C.F.R. § 281.16(d) (1966).

In 1959 it was the opinion of MARAD officials in San Francisco, contrary to PFEL's belief, that no official allocation of unsubsidized split voyages had been made for 1955 and 1956. Also, they were not certain of the date from which General Order 80 should apply to unsubsidized voyages. Upon request for clarification, the Office of Government Aid, by letter dated June 24, 1959, informed the San Francisco officials that General Order 80 criteria should apply to the financial results of split voyages occurring in 1955, 1956 and 1957. MARAD likewise informed PFEL, and MARAD's auditors-in-residence at PFEL (in San Francisco) proceeded on that basis with the 1955 and 1956 preliminary accountings. As a result, PFEL apparently became entitled to a net refund of approximately $750,000 of recaptured subsidy. PFEL requested use of that money in December 1959.

In January 1960 MARAD canceled the letter of June 24, 1959, and required that 1955 and 1956 be treated in the same manner as were 1953 and 1954. The only apparent reason for revoking the General Order 80 criteria was that the Office of Government Aid stated that "General Order No. 80 should not be applied retroactively to the years 1955 and 1956." Subsequently, MARAD, by letter dated March 7, 1957, informed PFEL of the change and explained that General Order 80 criteria applied only to voyages commenced on or after March 8, 1957. At the same time MARAD told PFEL which voyages were subject to recapture under the letter of November 25, 1953. Mr. Schulmeister, another MARAD examiner, analyzed the 1955 and 1956 split voyages using the substantial involvement and competitive impact standard in much the same manner as Callahan had done for 1953 and 1954. As a result, however, voyages excludable under General Order 80 criteria were included in the formula, thereby tending to increase recapture.

It is found that MARAD abused its discretion by repealing the General Order 80 criteria under the circumstances involved in this case. MARAD's authority to determine the split voyage allocation for recapture during this period springs from the letter of November 25, 1953, which, in turn, is based upon Article II–16 and, therefore, the objective of the letter was the prevention of competitive influence adverse to the subsidy program set up by the contract. MARAD felt that General Order 80 criteria measured the competitive nature of the split voyages. It used that method for 1957–60 also, and defendant contends that the substantial involvement/competitive impact standard was maintained throughout the recapture period. Also clear is the fact that the method used by Schulmeister likewise

measured competitiveness. No choice is made at this time with respect to the best method of the two used. It is found, however, that under the circumstances in this case MARAD could not first apply the General Order 80 method, and then revoke it in favor of another method without having a valid reason for the revocation.

MARAD reversed itself only after it found that the mathematical approach of General Order 80 resulted in less recapture than the rather subjective approach used by Schulmeister. One can only speculate about the merits of Schulmeister's approach. While his analysis was based on the same factors considered by Callahan, his analysis was inherently different perhaps because of the differences in human judgment and knowledge of individuals. Possibly such differences stimulated the formulation of the objective, mathematical formula set forth in General Order 80. The merits of the methods, however, are immaterial because we need only to determine whether the substitution of one for the other was permissible under this agreement. Because MARAD knew the effect of General Order 80 on recapture and the fact that it substituted an approach largely based on human judgment which caused results adverse to PFEL's interest, we look with suspicion at the stated reason for substitution.

 It is found that MARAD's only announced reason was the opinion that General Order 80 should not be applied retroactively. More is required than a mere statement that retroactivity is undesirable to make it so. MARAD should have a good reason for revoking an accounting procedure based upon a mathematical formula when the revocation takes place after the mathematical procedure had been applied in such a manner that the operator became entitled to a substantial sum of money and when the method substituted for the revoked procedure is based substantially on the personal judgment of a MARAD official. We see no material difference between the retroactive application of General Order 80 and the use of Schulmeister's schedule of includable voyages except that they produce different results. Schulmeister joined MARAD in 1957 which was, of course, after the accounting years of 1955 and 1956; and, by the terms of the November 25, 1953 approval, he could not evaluate the voyages until they were completed. By the same token, General Order 80 was promulgated April 25, 1957, (46 C.F.R. §§ 281.11–281.17 (1966)) and, likewise, could not be applied to specific voyages until those voyages were completed. Thus, in terms of actual treatment of the financial results of each voyage the method was inherently retrospective. Such retrospective treatment was the expressed intent of the condition imposed by the letter of November 25, 1953, and the reasonableness of that intent is not questioned. We simply notice the retrospective aspect in order to try to understand the reason for the change in methods, and from this point of view there is no difference between the use of either method. Further, from another point of view, the application of General Order 80 criteria to 1955 and 1956 would in effect be applying that criteria to periods which had elapsed before its promulgation as a regulation. MARAD, however, applied General Order 80 criteria to the period March 7, 1957 through April 25, 1957. This period is relatively short in comparison to the period January 1, 1955 to March 7, 1957, but there is no difference in the principle of retroactivity in the application of General Order 80. The application of General Order 80 was retroactive when applied from March 7, 1957, in the same manner as it would have been had it been applied from January 1, 1955. MARAD indicated that the application of General Order 80 criteria to 1955 and 1956 was adequate to protect the subsidy program when MARAD originally applied it to those years. There has been no suggestion that the revocation of General Order 80 criteria was based upon its unsuitability for this purpose, and, indeed, such contention would be difficult to sustain since MARAD used General Order 80 for subsequent years.

We are compelled to conclude that MARAD's statement, to the effect that the retroactive application of General Order 80 was undesirable, was meaningless and not the real reason for changing the method of accounting. We are left with the bald circumstance that MARAD changed its method of accounting after it discovered that PFEL was entitled to a large sum under its original procedure. MARAD's only concern must have been to secure for the defendant the maximum amount of money in the form of recapture. As such, this situation takes on the appearance of market place haggling and unreasonable retroactivity which offended this court in American President Lines, Ltd. v. United States, 291 F.2d 931, 936, 154 Ct.Cl. 695, 705 (1961). In that case there was a strong element of unreasonable discrimination in the administration of a different provision of the same statutory section (§ 606(5), 49 Stat. 2004 (1936), as amended, 46 U.S.C. § 1176(5) (1964)) which gives rise to this case. While there is no unreasonable discrimination present here, we think MARAD's change in accounting method was unreasonable because the change was based on the desire to increase its recapture interest, and, therefore, was not consistent with MARAD's discretion under Article II–16. That article was intended to protect subsidized services from the effects of adverse competition. MARAD lost sight of that protective goal when it changed the accounting method in order to increase the dollar amount of recapture. It is commendable for Federal officials to minimize the costs of government, but MARAD could only do so in this case within the framework of its contract. Since the above case is deemed to clearly establish that one may recover for an unreasonable exercise of discretion, it will be necessary to determine the actual damages resulting from MARAD's change in the accounting procedure.

In denying effect to the change in accounting procedure, we are supported by the history behind the statute requiring the inclusion of the recapture formula. Just prior to the time section 606(5) (49 Stat. 2004 (1936), as amended, 46 U.S.C. § 1176(5) (1964)) was again amended to increase the recapture period from 5 to 10 years (52 Stat. 953 (1938)) the Senate Committee on Commerce reported:

> A study of the financial history of the steamship business indicates that such incidents [extreme cyclical swings over long periods of time] are characteristic of the industry. Profits, while large in some instances and in others enormous, during prosperous periods, are usually counterbalanced by equally large or enormous losses in depression years. The proposed amendment recognizes this fact and adopts the recapture provisions to the cyclical nature of the industry. [S.Rept. No. 1618, 75th Cong., 3d Sess. 15 (1938).]

The report shows that Congress was concerned with attracting private capital through sound business practices (Id. at 3, 15) and, therefore, not with maximizing recapture by choosing some accounting method which would result in the greatest recapture as appears to be the case here.

From March 7, 1957 through 1960, General Order 80 criteria determined the inclusion of split voyages. There seems to be no doubt that General Order 80 tended to increase recapture for that period, as PFEL contends, There is some evidence to support a finding that General Order 80 should not have been applied to PFEL, and, indeed, it was abandoned after 1960. Despite the fact that MARAD used General Order 80 to measure competitiveness for several years, plaintiff insists that General Order 80 does not accomplish that result. Plaintiff's view may well be correct, but it has adduced little or nothing to support its contention. At most it can be stated that General Order 80 does not appear to be a proper yardstick of measurement. As previously stated, the court is not particularly concerned with the relative merits of several suggested approaches which might be utilized but only with the issue of whether MARAD abused its discretion in using General Order 80. MARAD

considered General Order 80 to be a refinement of the substantial involvement standard. Whether it was a poor refinement or a matter for MARAD to consider, it is neither an issue nor a basis for relief in this case.

There is no dispute over the financial treatment of split voyages in 1961 and 1962. We need not discuss these years except to say that MARAD, at PFEL's urging, instituted a new refinement of the substantial impact standard in order to replace General Order 80.

Plaintiff contends, however, that the various changes over the entire recapture period from one method to another constitute inconsistent and unreasonable treatment. There is nothing in Article II–16 requiring the same precise measure of competition during the recapture period. Events occurring before and during that time suggest changing patterns of competition. A voyage considered competitive at one time might not be competitive at another time. The plaintiff has not been of much assistance in the consideration of competitive factors. MARAD, having the discretion to determine which voyages were competitive, was not limited by the contract to a formula with which it was reasonably dissatisfied. There is no inherent unreasonableness in MARAD's use of several different methods during the recapture period. Plaintiff has not chosen to present an analytical attack relating to whether MARAD's use of these methods was actually based upon the competitiveness of nonsubsidized voyages with the subsidized service, and, therefore, we need not accord detailed consideration to this aspect of the case as suggested by plaintiff's contention.

### Fourteen On-Route Iron Ore Voyages

■ Fourteen bulk voyages by nonsubsidized vessels, chartered by PFEL from the defendant, require separate discussion. PFEL, attempting to increase its bulk business, had contracted to carry large quantities of iron ore from the United States to Japan. Economic conditions caused the ore to pile up at Stockton, California, to the extent that the port facilities there were severely damaged, creating an emergency situation. Unable to fulfill its commitment with its own vessels, PFEL applied for and, because of the emergency, was granted permission to charter Victory vessels from the defendant by the Federal Maritime Board pursuant to Public Law 81–591 (64 Stat. 308 (1950), as amended, 50 U.S.C.App. § 1738(e) (1964)). Pacific Far East Line, Inc., 4 F.M.B. 785, 794–797 (Docket No. M–64, 1956). Consequently, MARAD and PFEL entered into a contract to this effect on March 23, 1956, which provided that the chartered vessels could only carry the ore on voyages outbound to Japan. The contract also provided that subsidized vessels calling at Japan would carry at least 3,500 long tons of ore per voyage.

MARAD felt that these unsubsidized ore voyages were dissimilar to subsidized liner[10] operations in that the charter contract contemplated a nonliner, single commodity, bulk operation serving only one subsidiary United States port. Further, MARAD expected the voyages to result in net losses because profitability depended primarily upon the highly speculative possibility of obtaining an agreement by the sea-going unions to reduce manpower on the vessels; and even with such an agreement, losses were likely.

Thus, on March 29, 1956, after the contract was executed, MARAD informed PFEL by letter that, contrary to the usual treatment of on-route voyages, because of the circumstances surrounding these unsubsidized ore voyages, the financial results would be excluded from recapture accounting. The exclusion occurred and plaintiff complains of that action by MARAD. It appears that this court should determine whether MARAD had the right to follow the condition set forth

10. "Liner" has been defined as a trading vessel used on a particular route with regular sailings. DeKerchove, International Maritime Dictionary 457 (2d ed. 1961).

in the letter of March 29, 1956, namely, exclusion of recapture accounting. Based on the facts reflected herein, it is appropriate to estop MARAD from giving effect to the provisions of the letter of March 29, 1956. The charter contract imposed several obligations on PFEL, the foremost of which was an obligation to charter seven vessels from the defendant. The contract limited the vessels to the carriage of ore from Stockton, California, to Japan. At the time the contract was executed, MARAD's letter approving non-subsidized bulk service dated November 25, 1953, was in effect. Since these 14 voyages to Japan by chartered vessels were conducted over a 9-month period, they appear to come within the phrase "one or two sailings monthly direct to Japan and Korea with bulk cargo * * *" which is part of the approval of November 25, 1953. The approval also provided that the voyages would be included in the recapture formula. There is nothing in the record which indicates that plaintiff thought the approval of November 25, 1953, was not applicable to those ore voyages at the time the charter contract was executed. In addition, the charter contract tied the movement of this ore to the subsidized service by requiring subsidized vessels to carry at least 3,500 tons of the ore, but the charter contract said nothing about recapture. While we have made no finding that PFEL in fact believed the voyages conducted by these chartered vessels would be subject to the recapture formula, it would be unreasonable for us to conclude otherwise in view of the circumstances described herein. As pointed out above, MARAD recognized that inclusion in the recapture formula was the normal practice. Further, the charter contract said nothing about recapture. At the very most, in defendant's favor, is the ambiguity, if any, in the letter of November 25, 1953, from the phrase "to Japan *and* Korea,"

[emphasis added] and we cannot say PFEL interpreted it unreasonably. Kraus v. United States, supra.

We do not deal with whether MARAD could have tried to insert the exclusionary condition in the contract or could have imposed it prior to March 23, 1956. Its failure to do so before PFEL became obligated under the charter agreement is the reason for our decision. Had PFEL known in advance that these voyages, which would probably be unprofitable, would not receive recapture treatment, it might not have entered into the contract. Of course, if PFEL took that action, it probably would not have been able to meet its commitments to deliver the ore. Pacific Far East Line, Inc., 4 F.M.B. 785 (Docket No. M-64, 1956). However, that choice was for PFEL to make, and there is evidence to suggest that foreign flag operators could have done so. Clearly, from PFEL's point of view the economic value of these voyages is lessened by exclusion. We take the modern approach and invoke the doctrine of equitable estoppel [11] because defendant's actions mislead plaintiff to its detriment, and good conscience precludes defendant from repudiating its conduct on which PFEL reasonably relied. Mahoning Inv. Co. v. United States, 3 F. Supp. 622, 629–630, 78 Ct.Cl. 231, 246–248 (1933), cert. denied, 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064 (1934); Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 768–769, 120 Ct.Cl. 72, 91–93 (1951), cert. denied, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669. These 14 on-route ore voyages must be included in the recapture formula because that is the treatment they would have received had MARAD not followed the letter of March 29, 1956.

### Certain Individual Voyages

We shall now discuss certain specific voyages which were excluded. First, the

---

11. Since the theory of equitable estoppel is an adequate basis for our decision on this issue, we need not consider the possibilities that the letter of November 25, 1953, gave rise to a promissory estoppel (see Gay, Trustee v. United States, 174 Ct.Cl. 420, 434, 356 F.2d 516, 524, cert. denied, 385 U.S. 898, 87 S.Ct. 202, 17 L. Ed.2d 130 (1966) or to another contract (see Himfar v. United States, 355 F.2d 606, 609–610, 174 Ct.Cl. 209, 214–215 (1966)).

*Tosina,* voyage 1, conducted in 1955, should not be included in the recapture formula as an unsubsidized on-route voyage because the evidence fails to establish that it was an on-route voyage conducted under the authorization letter of November · 25, 1953. The evidence not only poses an irreconcilable conflict as to whether the voyage was split or on-route, but there is no showing that the November 25, 1953 authorization governs the financial treatment of this voyage as plaintiff contends it does.

Voyage 1 of the *Portland Trader* carried cargo, which PFEL's regular berth vessels were unable to handle, inbound from the Philippines to California in 1955. A letter of approval of this voyage, dated May 2, 1955, responds to a specific request by PFEL to conduct the voyage and the approval provided that the financial results of the voyage would be included in recapture unless inclusion would reduce recapture. Those results were excluded. The letter of November 25, 1953, only deals with outbound voyages (from California), and, therefore, could not have contemplated the voyage of the *Portland Trader.* Since PFEL filed a specific request and MARAD granted conditional approval, the parties must have realized that the voyage was competitive although it is difficult to find the competitive aspect in view of the fact that other vessels could not accommodate the cargo. If it were competitive, it is established that MARAD had the right to provide for exclusion from recapture. If it were not competitive, we do not see why its financial results should be included in the recapture formula

because plaintiff has not given us any reason for avoiding the 1955 approval.[12]

 Plaintiff contends that the financial results of three 1954 voyages should have been included in recapture. These are the voyages we excepted from our above discussion regarding split voyages. Voyage 1 of the *Nikobar* loaded cotton in Mexico, called at Los Angeles for bunkers. Bunkers are compartments used for fuel storage. DeKerchove, International Maritime Dictionary 106 (2d ed. 1961). The *Nikobar* loaded no cargo at Los Angeles, and proceeded to a foreign port. MARAD treated it as a voyage between foreign ports only and excluded its financial results from recapture. Plaintiff contends it was a split voyage. The *Canada Bear,* voyage 23, and the *Hawaii Bear,* voyage 20, were time-chartered to the Military Sea Transport Service at Guam, and did not call at a foreign port on the subsidized service while operated by PFEL. Under the letter of November 25, 1953, off-route voyages were excludable from recapture. Assuming that the *Nikobar,* voyage 1, was a split voyage, we may treat all three of these voyages alike for the purposes of this claim. Paragraph (e) of the letter of November 25, 1953, provides that the financial results of split voyages "shall be accounted for on the basis of each such voyage as determined by the Administration with respect to each six-month period of terminated voyages." This language plainly reserves to MARAD the discretion to decide whether completed split voyages should be subject to recapture. But, as we demonstrated above, this discretion may not be exer-

12. On January 14, 1953, PFEL requested MARAD's approval to operate nonsubsidized dry cargo voyages in the area of the subsidized service. On February 19, 1953, MARAD wrote to PFEL and denied the request. However, MARAD provided that PFEL must make prior requests for voyages it desired to conduct in a subsequent month. By this means MARAD retained the right to approve nonsubsidized on-route voyages as they were needed to meet requirements for carriage of dry cargo. As to recapture, MARAD further provided that the financial results of approved voyages, regardless of cargo carried, should be included in the net earnings from subsidized voyages because the approved voyages would be conducted exclusively within the subsidized service. Plaintiff has not linked the letter of February 19, 1953, to the Portland Trader, voyage 1, and, therefore, we are not faced with any conflict between that letter and the letter dated May 2, 1955, approving voyage 1 of the Portland Trader.

cised unreasonably. The only fact plaintiff cites, which might tend to show an unreasonable exclusion, is that each voyage touched a port on the subsidized service. We have already decided that the single fact that a voyage touches the subsidized service or route does not establish that it is necessarily incident to the subsidized service. Since the cargo carried by the *Nikobar,* voyage 1, originated outside the subsidized service, we do not see how it can be related to the subsidized service and plaintiff has not assisted us in this regard. Similarly, since the *Canada Bear,* voyage 23, and the *Hawaii Bear,* voyage 20, generated no revenues from cargo carried by PFEL on the subsidized service, there is no apparent unreasonableness in the exclusion of these two voyages. Again, plaintiff has not pointed out factors showing any unreasonable treatment in that regard. This claim was well-tried and well-briefed by both parties. There should be no speculation as to why the treatment of these three voyages might be improper, and we need not search the record to establish impropriety. Cf. H. R. Henderson & Co. v. United States, 169 Ct.Cl. 228, 249 (1965). Consequently, we cannot conclude that these voyages were improperly excluded from the recapture formula.

The financial results of three off-route voyages—*Alaska Bear,* voyage 47, *Hawaii Bear,* voyage 50, and *India Bear,* voyage 5—were included in PFEL's 1961 earnings from subsidized operations. The parties have agreed that each inclusion was inadvertent and improper, and that the financial results must be excluded from subsidized earnings whatever the result of this litigation may be.

### PFEL's Failure to Exhaust Its Administrative Remedy

Defendant suggests that PFEL should have pursued its claims under General Order No. 78, effective since January 1956 (46 C.F.R. Part 205 (1965)), and

that, having failed to do so relief should be denied. When this action was commenced, General Order No. 78, provided:

§ 205.2 Policy. Any contractor * * * who disagrees with the findings, interpretations, or decisions reflected in an audit report of the Maritime Administration and who fails to settle said differences by negotiation * * * *may* submit an appeal against such findings in accordance with the procedure set forth in this part. [Emphasis added.]

§ 205.3 Procedure. (a) Appeals, as described in § 205.2, shall be made * * * within six months following the date of the document notifying the contractor * * * of the *final* audit findings * * *. [Emphasis added.]

The regulation provided [13] a permissive remedy after the final audit findings.

Until 1960, when MARAD changed the accounting method for 1955 and 1956 from the previously utilized General Order 80 criteria, PFEL was satisfied with the procedure followed. The accountings for 1955 and 1956 became final in December 1960 and January 1961, respectively.[14] Had PFEL appealed in 1960 or 1961, it would have been faced with the possibility that future losses would eliminate excess profits in view of the fact that Article II–28 provides that excessiveness depends on whether profits during the recapture period have "averaged more than 10 per centum per annum." See United States v. Moore-McCormack Lines, Inc., 308 F.2d 866, 871 (4th Cir. 1962), cert. denied, 372 U.S. 944, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963). To have appealed in 1961 would have been wasteful and premature.

After 1962 the parties probably knew whether PFEL was in a recapture position. However, the final accounting for 1962 had not been filed when this case came to trial. In fact, final accountings for 1959–61 had not been returned to

13. On September 11, 1965, General Order 78 was revised to exclude the word "final" from § 205.3(a), 46 C.F.R. § 205.3(a) (1966).

14. Also, the first preliminary accounting for 1955 was returned to PFEL in 1958. Clearly PFEL's action, filed in 1963, is not time-barred. Oceanic S.S. Co. v. United States, 165 Ct.Cl. 217 (1964).

PFEL by that time. To await the final accountings for those years in order to pursue its permissive remedy might have barred plaintiff's suit in this court. Nager Elec. Co. v. United States, 368 F.2d 847, 853, n. 11, 177 Ct.Cl. 234, 243, n. 11 (1966). There appears to be no sound reason to hold that under these circumstances, plaintiff should have pursued its administrative remedy. Cf. Adler v. United States, 146 F.Supp. 956, 957–958, 134 Ct.Cl. 200, 202–203 (1956), cert. denied sub nom., Baker v. United States, 352 U.S. 894, 77 S.Ct. 131, 1 L.Ed.2d 87; Mallow v. United States, 161 Ct.Cl. 207, 212 (1963); Pine v. United States, 371 F.2d 466, 467, n. 1, 178 Ct.Cl. 146, 149, n. 1 (1967).

Plaintiff has presented its evidence relating to the issues of liability and damages. Defendant has been permitted to reserve the right to present its defense on the issue of damages. If defendant presents such defense, plaintiff will have an opportunity for rebuttal. This case should be remanded to the commissioner to determine the amount of plaintiff's damages resulting from defendant's liability pursuant to Rule 47(c) under the four categories listed: (1) The General Order 80 criteria should be applied to the financial treatment of split voyages during the period January 1, 1955 through March 7, 1957. (2) The financial results of the 14 on-route iron ore voyages from Stockton, California, to Japan during 1956 should be included with the net earnings from subsidized operations for recapture purposes. (3) The financial results of the *Alaska Bear,* voyage 47, the *Hawaii Bear,* voyage 50, and the *India Bear,* voyage 5, should be excluded from PFEL's 1961 net earnings from subsidized operations. (4) Plaintiff is not entitled to have the financial results of any other voyages included in its net earnings from subsidized operations.

NICHOLS, Judge (dissenting).

I am compelled to dissent because I do not read the contract here involved as my brothers do.

They say, if I understand them, that Article II–16 read with Article II–28 gave MARAD the "discretion" to say that a nonsubsidized voyage was competing with a subsidized voyage and so finding to bring it within the recapture accounting (or refuse to do so), to assure that recapture would reflect the financial results of the "competing" nonsubsidized service (or not do so, as seems desirable) and thus prevent erosion of the recapturable profits by destructive competition. MARAD apparently was of the opinion that any voyage over the area of the subsidized route was competitive because it might "infringe retroactively or prospectively on the subsidized service." (Finding 12d.).

The Government, the commissioner, and the court all seem indeed to assume, further, that any other voyage by plaintiff's vessels in the foreign commerce of the United States is competition with the subsidized vessels on Route 29, no matter where they go or what they carry. If I misunderstand the position I would be glad to be told. But observe, for example, the Government brief, p. 14:

\* \* \* \* \* \*

Accordingly, every subsidized operator contractually agrees to restrict *all operations in the foreign commerce of the United States to* [the subsidized voyages] \* \* \* (Emphasis supplied.)

And how does the operator make such an agreement? He does it, according to the Government "In clear and unambiguous language" in Article II–16, the agreement not to compete except with MARAD consent. Thus the Government *clearly* says that if plaintiff operated an unsubsidized route from New York to Greenland, it would be in "competition" with the subsidized ships on Route 29 and would have to have MARAD consent or else cease and desist. Of course, I recognize that as a practical matter voyages by plaintiff's ships in the Atlantic, the Mediterranean, or the Indian Ocean might be banned because in competition with other subsidized American flag lines. The point is that considerations

of real economic competition are here put aside. The word is simply a name for all operations in foreign commerce. The actual competitive impact only comes to be considered to establish whether MARAD should exercise its discretion under II–16, which is to allow a competitive voyage to be made regardless of its competitive effect. Thus no voyage anywhere is outside the reach of its power, should it in its wisdom decide that the voyage should not be made, or should be made subject to conditions only.

It seems obvious to me that an operation which is "incidental," whatever that means, may or may not be competitive. If, e. g., it provides "reefer" (refrigeration) service when the subsidized ships have no "reefer" space, that is "incidental" but not competitive. Of course, you may say if there were no reefer service offered maybe shippers would export food on the subsidized ships preserved in other ways. More likely, however, they would resort to foreign "reefer" tonnage and the trade would be lost to American flag ships, both subsidized and unsubsidized. You may say all the lawyers in a town are in competition with all the doctors, because the more the people spend for doctors, the less they have for lawyers. I would hold an unsubsidized ship is in competition with one which is subsidized only if it offers to carry to the same port or a nearby one a class of cargo the subsidized ship is ready and able to carry, so the shipper has a choice which service to employ. As I understand it, subsidized "berth" liners are normally not suited to carry large quantities of bulk cargo although the Mariner class when procured had a limited bulk capacity. Therefore a supplemental service to accomplish a large bulk cargo movement, is not competitive either. The undisputed power of MARAD to prevent the carrier from operating in direct competition with itself or another subsidized carrier would seem ample to control the diversion of profits from recapturable to nonrecapturable accounts by diversion of cargo, and no jockeying

with the coverage of recapture accounting is needed. I do not think the possibility that an unsubsidized voyage will reduce recapture if subject to recapture accounting, suffices to make it "in competition."

Whatever an "incidental" service is, to me it includes supplemental or complementary services such as any carrier must offer to hold its customers and meet its competition. Such services are in support and not in competition and they may contribute to make the subsidized operation more profitable, whether or not profitable themselves.

There may be instances of services which truly are both "incidental" and "competitive", but it appears to me they would be infrequent. It would include cases where the service was complementary to the owner's subsidized service but competitive with the subsidized service of another carrier. No competition such as this was found here; it was merely hypothesized *arguendo*. At times there may be cases where the harm from the competition would be measurable but not enough to justify stopping it in light of the basic objective of the Act, which after all is to keep the American flag on the ocean.

What MARAD appears to me to have done is to stretch the prohibition against unauthorized competition to cover, in its discretion, practically anything the carrier might do, so that by conditioning its consent on subjection to recapture accounting in the case of on-route voyages, and split voyages when it so chooses, and exclusion likewise when it so chooses, it can manipulate the recapture accounting to make it produce the results it desires. I find it difficult to connect with any other rational policy the yoking up of the horse of Article II–16 with the ox of Article II–28, and the fine, resounding, but to me vague, guideline: "competitive impact/substantial involvement."

As I see it, MARAD was burdened with the duty to determine what voyages were "in competition" and in doing so it could, within reasonable limits, define the word, but not stretch it beyond all reason. When and only when it had reasonably determined that a voyage was "in competition" it was clothed with discretion whether or not to allow it to take place, or to impose conditions on its taking place. As the "reefer" voyages here involved, e. g., were noncompetitive before there was reefer space in the subsidized ships, by any reasonable definition, it could not prohibit them and therefore could not limit their allowance to conditions not otherwise authorized.

As to what voyages were subject to recapture accounting, that was a separate issue to be resolved under different rules. In deciding what voyages were "incidental," the agency had, not discretion to regulate, but something entirely different though often confused, the power to interpret a statutory provision stated in general terms, and intended for the agency to administer. Within limits, courts will accord such interpretations great weight. They must, however, be reasonable and be adhered to consistently. If an agency yaws and veers about, none of its interpretations have weight. No court, I suppose, would doubt that on-route voyages were incidental and off-route voyages not. The split voyages are where we are in trouble. Not only has MARAD shifted continually, but it has tried to find a basis for uncontrolled discretion on the alleged power to consent on conditions, which in the cases of non-competitive voyages it did not have.

It appears to me that the real question at issue here is one that MARAD and our commissioner have not come to grips with, at least not in any overt manner. No doubt it is a latent consideration in their minds. It is whether a subsidized carrier, fortunate enough to be realizing enough profit to create a "recapture position," may in its discretion divert otherwise recapturable profits to maintain supplemental noncompetitive (in a real sense) services to hold as much business as possible in its hands, or whether MARAD in its discretion may limit such economic activity in order to maintain the recapturable fund at a high level. In this regard it may be noted that the policy of the basic legislation is that "It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry * * * a substantial portion of the water-borne export and import foreign commerce of the United States * * * " 46 U.S.C. § 1101. It is common knowledge that, today, the portion so carried is at best not more than substantial. It would appear that the carrier's position in this litigation will, to the extent it prevails, cause more vessels to be operated under the United States flag, while MARAD's will add more of them to the mothball fleet. To that extent the policy of the Act favors the carrier. On the other hand, subsidy funds are already committed to the legislative purpose and recapture of them, though commendable, is an incidental benefit rather than an object of top priority. The answer, however, must be found in the text of the contract. It is assumed in this litigation that the carrier may operate on its route unsubsidized incidental services, except those barred as involving damaging competition. MARAD, not satisfied with its undisputed power to bar, seeks to manipulate its recapture accounting so as further to prevent depletion of the recapturable fund. I do not see what statute or contract provision gives it this power. To find it, one must read into contract clauses words that are not there, i. e., "incidental" must be read as meaning "in competition" and "in competition" read as meaning "incidental" though naturally their import is entirely different. If the framers of this contract meant such different words to mean the same thing one wonders why it did not

occur to them to use the same words in both the clauses involved.

It may be argued that to favor the carrier herein would leave MARAD defenseless against loss through uneconomic and wasteful operation of unsubsidized ships when it could not find direct competition. Considering, however, the limited scope and contingent nature of recapture accounting, it seems reasonable to suppose that the ordinary laws of supply and demand would compel prudent operation by maintaining most of the adverse consequences that imprudence may entail. If the Government wants more it should write a clause making its intention clear.

Because of my views as stated above, I am unable to join the court in affirming the commissioner's findings and adopting his opinion as its own.